IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | Civil Action No. 3:14-cv-3635-N-BG |
| v. | § § | |
| DANIEL T. BOGAR, ET AL. | § § | |
| Defendants. | § § | |

---

### THE RECEIVER'S FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2) EXPERT DISCLOSURES REGARDING JAMES SPINDLER

---

Plaintiff Ralph S. Janvey, the Court-appointed Receiver, hereby provides the following Federal Rule of Civil Procedure 26(a)(2)(B) Expert Disclosures Regarding James Spindler, to Defendant Osvaldo Pi, subject to potential supplementation pursuant to Federal Rule of Civil Procedure 26(e)(2):

**(i) A complete statement of all opinions the witness will express and the basis and reasons for them;**

A complete statement of all opinions stated by the Receiver's testifying expert witness, James Spindler, and the basis and reasons for such opinions, are set forth in the Expert Declaration of James Spindler ("Spindler Expert Declaration"). The Spindler Expert Declaration is attached hereto as **Exhibit 1.**

1



EXHIBIT
1

1.001

**(ii) The facts or data considered by the witness in forming them;**

The facts and data considered by Professor Spindler in forming his opinions are set forth in **Exhibit B** to the Spindler Expert Declaration, which is attached hereto.  A disc containing any documents referenced in **Exhibit B** to the Spindler Expert Declaration, which have not been previously produced is this matter, is attached hereto.

**(iii) Any exhibits that will be used to summarize or support them;**

The Receiver may use the documents referenced herein and in the Spindler Expert Declaration to support the testimony of Professor Spindler.

**(iv) The witness's qualifications, including a list of all publications authored in the previous 10 years;**

Professor Spindler's qualifications are set forth in **Exhibit A** to the Spindler Expert Declaration, which is attached hereto.

**(v) A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and**

Professor Spindler has testified at deposition in the following matters within the previous four years:

- Deposed in 2013 in *William Casey Fox v. Biomedical Enterprises*, Case No. 2010-CI-20399 in the 285th Judicial District of Texas in Bexar County, Texas. The case settled out of court in 2013.

- Deposed in 2014 in *Tesoro Refining & Marketing Company LLC v. National Union Fire Insurance Company of Pittsburg*, No. SA-13-00931-DAE, in the United States District Court, Western District of Texas, San Antonio Division, transferred from

1.002

Case No. CV13-3238 ABC in the United States District Court, Central District of California. The case is still pending.

- Deposed in 2015 in *Italian Investors, LLC v. McGehee*, Case No. DC-13-07398, in the 68th Judicial District in Dallas County, Texas. The case settled in 2015.

**(vi) A statement of the compensation to be paid for the study and testimony in the case.**

Professor Spindler is being compensated for his work on an hourly basis at the rate of $650.00 per hour. This hourly rate does not exclude amounts subject to the Court's holdback order.

The Receiver hereby reserves the right to supplement the foregoing disclosures pursuant to Federal Rule of Civil Procedure 26(e)(2).

Dated:  July 22, 2016          Respectfully submitted,

**BAKER BOTTS LLP**

By: */s/ Scott D. Powers*_____
    Kevin M. Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Scott D. Powers
    Texas Bar No. 24027746
    scott.powers@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    98 San Jacinto Blvd., Suite 1500
    Austin, TX  78701-4039
    (512) 322-2500 (Telephone)
    (512) 322-2501 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

1.003

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 22, 2016, a true and correct copy of the above and foregoing document was sent to the following counsel of record as follows:

J. Mitchell Little
SCHEEF & STONE LLP
2600 Network Boulevard, Suite 400
Frisco, Texas 75034
*Via First Class U.S. Mail*
*(w/ courtesy copy via e-mail to Mitch.Little@SolidCounsel.com)*

Charlene C. Koonce
SCHEEF & STONE LLP
500 North Akard Street, Suite 2700
Dallas, Texas 75201
*Via First Class U.S. Mail*
*(w/ courtesy copy via e-mail to Charlene.Koonce@SolidCounsel.com)*

Thomas L. Taylor III
THE TAYLOR LAW OFFICES, P.C.
4550 Post Oak Place Drive, Suite 241
Houston, Texas 77027
*Via First Class U.S. Mail*
*(w/ courtesy copy via e-mail to taylor@tltaylorlaw.com)*

J. Randle Henderson
16506 F.M. 529, Suite 115-107
Houston, Texas 77095
*Via First Class U.S. Mail*
*(w/ courtesy copy via e-mail to jrh@hendersonrandy.com)*

*/s/ Scott D. Powers*
Scott D. Powers

1.004

# EXHIBIT 1

**to the Receiver's Rule 26(a)(2) Expert Disclosures
Regarding James Spindler**

**Report of James C. Spindler**

*Ralph S. Janvey v. Daniel Bogar, Osvaldo Pi, and Bernerd Young*

**Case No. 3:14-cv-3635**

**July 20, 2016**

**Table of Contents**

I.    Introduction and summary of opinions ................................................................3

    A.   Scope of report and expertise ........................................................................3

    B.   Summary of conclusions .................................................................................4

    C.   Documents reviewed ........................................................................................8

II.   SGC and Pi's role as private equity fund managers .............................................8

    A.   SGC ...................................................................................................................8

    B.   Pi .....................................................................................................................10

III.  Red flags ..............................................................................................................13

    A.   The use of SIBL funds for non-SIBL purchases ............................................14

    B.   Valuation ........................................................................................................16

    C.   Professed ignorance of SIBL investment policies...........................................19

    D.   Conflicts with SIBL investment policies and representations ........................21

        1.   SIBL's investment policies and representations .............................................21

        2.   Reasons to believe Pi knew of these policies ..................................................23

IV.   Reasonable investigation and actions upon observing red flags .......................25

V.    Warrants ..............................................................................................................27

VI.   Conclusion ...........................................................................................................35

2

## I.      Introduction and summary of opinions

### A. Scope of report and expertise

I have been asked to provide this report and my opinion on various matters in *Ralph S. Janvey v. Daniel Bogar, Osvaldo Pi, and Bernerd Young,* Case No. 3:14-cv-3635.   The scope of my opinions includes an analysis of Defendant Osvaldo Pi's conduct from my perspective as an expert in corporate governance, economics, the securities industry, and corporate finance.   Among other things, I have considered the following:

- The typical and customary role of an investment adviser and private equity fund manager,
- Issues arising at Stanford Group Company ("SGC") and Stanford International Bank ("SIBL") that should have raised a suspicion of wrongdoing (i.e., red flags) for an investment adviser and private equity fund manager,
- The duties of such a person upon observing those red flags, and
- Conflicts of interest that arise when an investment adviser and private equity fund manager accepts outside compensation.

My expertise extends to the matters discussed in this report.   I am the Sylvan Lang Professor of Business Associations at the University of Texas School of Law and a Professor at the University of Texas McCombs School of Business.   My academic research and teaching focus on areas including corporate fraud, corporate finance,

corporate governance, capital markets, executive compensation, and tax.   In particular, my research, teaching, and consulting include the practices, rules, and standards applicable to investment advisers, broker-dealers, the securities industry, private equity, and banking.   I hold an A.B. from Princeton, a J.D. from Harvard Law School, and a Ph.D. in economics from UCLA.   Formerly, I practiced in corporate law, credit, and securities regulation with Cravath, Swaine & Moore LLP in New York and Hong Kong.

My curriculum vitae is appended to this report as Exhibit A.

**B.  Summary of conclusions**

My conclusions are as follows:

1.  SGC provided consulting and investment advisory services to SIBL and other Stanford affiliates, which included managing a private equity portfolio on SIBL's (or the affiliates') behalf.  SGC acted as an investment adviser to, and agent of, SIBL and those affiliates.

2.  As is well understood in the financial services industry, an investment adviser or one who manages a discretionary account on another's behalf owes duties of care and loyalty to the beneficiary of his services (the "client" or "principal").   In the investment advisory context, these duties include making sure the investments are suitable and appropriate for the client, the obligation to safeguard the client's assets, not making false representations of competence, and the duty to disclose outside compensation or secret profits.

4

3. Osvaldo Pi ("Pi"), as an employee of SGC, provided consulting and investment adviser services to SIBL and other Stanford affiliates, and played a significant role in managing a private equity portfolio on their behalf. As such, Pi was also an investment adviser to, and agent of, SIBL and those affiliates, and was generally subject to the same duties as was SGC. Pi was also subject to duties imposed by agreements he signed as a condition of his employment.

4. The record reflects that Pi was or should have been aware of several red flags that, at the least, suggested the possibility of significant wrongdoing or misconduct. These include the following:

   a. Pi engaged in and facilitated the use of SIBL funds to purchase private equity interests that were owned not by SIBL, but by Allen Stanford's wholly-owned companies. Pi became aware of this not later than January 14, 2004.[1] Such purchases resulted in a transfer of value from SIBL depositors to Allen Stanford.

   b. Pi provided valuation outlooks of portfolio companies to be used as a basis for valuing certain assets on SIBL's financial statements. Pi

---

[1] See F734-E02580679 (email from Veronica Martinez to Pi dated January 14, 2004 "attach[ing] the list of the wires that went from SIB direct to the companies in which SVCH has investments.")

1.010

was aware of this not later than January 19, 2005.[2]  Such use of those projections was improper, as Pi has testified, as they are not reliable or impartial and would pose a danger of inflating the reported value of SIBL's assets.  This did, in fact, inflate SIBL's reported valuation.

c.  While Pi states he was ignorant of SIBL's public representations and its investment policies, such ignorance would be incompatible with the obligation to ensure that any private equity investments were suitable for SIBL.  Such ignorance would have been a violation of his obligations as an investment adviser to SIBL from shortly after the start of his employment, which began on December 12, 2000.

d.  Notwithstanding his professed ignorance, Pi should have been affirmatively aware that SIBL's policies and public representations were at odds with its private equity investments for a variety of reasons: his position as a high-ranking investment officer required it; Pi was encouraged to cross-sell SIBL CDs by his direct superior on multiple occasions; and he investigated SIBL's lending policies in connection with his advisory services.  Pi was, or should have been, affirmatively aware of SIBL's lending policies not later than August

---

[2] See F734-E02580520 (email from Pi to Mark Kuhrt dated January 19, 2005 regarding transfers from SVCH to SIBL and enclosing "estimated valuation outlooks... to help you with such transfer.")

13, 2003, the date he reported having investigated SIBL's lending policies.[3]

5. When faced with such red flags, an individual in Pi's position would not have been able to proceed with business-as-usual without undertaking some investigation to determine whether there was, in fact, misconduct. Any reasonable investigation would have revealed that the private equity investments were allowing Allen Stanford and his wholly-owned entities to take assets out of SIBL, that the valuations of the portfolio companies transferred back into SIBL were not reliable, and that SIBL's representations and investment policies did not allow such private equity investments and loans.

6. As is well understood in the financial services industry, it is improper for an investment adviser to obtain secret profits from trades that he recommends without fully disclosing that compensation in advance to his principal. In addition, Pi signed agreements as a condition of his employment that required him to avoid conflicts, disclose conflicts fully, and to receive prior written permission from his supervisor and compliance officer in order to accept any outside compensation. According to his testimony, Pi negotiated and accepted outside deal compensation without fully and appropriately disclosing that compensation and in violation of relevant internal policies and the agreements that he signed. Such compensation created clear

---

[3] See F734-E01584219 (email from Pi to Danny Bogar dated August 13, 2003 regarding SIBL loan to Superior).

conflicts of interest and is contrary to basic principles of agency, the rules governing investment advisers, and the terms of Pi's employment with SGC.

## C. Documents reviewed

In forming my opinions, I have relied on the documents attached as Exhibit B to this report, or as herein cited.

## II.   SGC and Pi's role as private equity fund managers

### A. SGC

SGC was a registered broker-dealer and investment advisor.[4]  While ostensibly a full-service brokerage and adviser, SGC's primary business was selling SIBL CDs through a network of financial advisors, for which SIBL paid above-market commissions or referral fees to SGC.

In addition to its sales of SIBL CDs and limited other products, SGC also obtained revenues by providing consulting and investment advisory services to SIBL and other Stanford affiliates.  Pursuant to a Financial Consulting and Advisory Services Agreement,[5]  SGC provided investment advice and managed a private equity

---

[4] SEC Complaint dated February 16, 2009, SEC v. Stanford International Bank, Ltd., et al., (N.D. Tex.) at ¶20.

[5] See STAN RINCON 0007727 – 0007732 (Financial Consulting and Advisory Services Agreement between SGC and SIBL dated December 1, 2004); F734-E01520693 (Financial Consulting and Advisory Services Agreement between SGC and SVCH dated January 1, 2004). While this agreement was effective as of December 1, 2004, SGC and Pi's function managing

portfolio (sometimes referred to as merchant banking or venture capital), in which Stanford entities held investments in speculative, illiquid company securities.

As is well-understood in the financial services industry, an investment adviser such as SGC is a fiduciary of its clients, and is charged with the duties of loyalty and care. The duty of loyalty means that an investment adviser must place the client's interest ahead of its own and cannot act adversely to the client. The duty of care requires the adviser to manage the client's assets as a reasonable person would manage his own assets. As is also well-understood in the securities industry, investment advisers' fiduciary duties include the following specific duties:

- Investment advisers must disclose all actual and potential conflicts of interest, including all commission income or other fee income earned in relation to the transaction.[6] The failure to do so constitutes a deceptive act or practice.[7]

---

SGC's private equity portfolio precedes this date. See, e.g., STAN PI 0000850 at 0000909 (email from Pi dated January 15, 2001 to Danny Bogar describing Pi's "action plan," which included private equity portfolio management activities).

[6] See, e.g., Study on Investment Advisers and Broker-Dealers, U.S. Securities and Exchange Commission, January 2011 (available at http://www.sec.gov/news/studies/2011/913study final.pdf); Form ADV Part II at 1-2; In re Laurence Albukerk and EB Financial Group, LLC (SEC File No. 3-14801, March 14, 2012).

[7] See, e.g., In re Laurence Albukerk and EB Financial Group, LLC (SEC File No. 3-14801, March 14, 2012) at ¶32.

9

- Investment advisers are obliged to ensure the suitability of the investment advice:  an adviser "must make a reasonable determination that the investment advice provided is suitable for the client based on the client's financial objectives."[8]

- An investment adviser has a "duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information."[9]

- An investment adviser cannot make false representations, whether explicit or implied, about its competence.[10]

These duties extended to SGC's individual clients (who largely purchased SIBL CDs based on advice and referrals provided by SGC), as well as to SIBL and other Stanford affiliates that relied upon SGC to provide consulting and investment advisory services with regard to private equity investments.

## B.  Pi

Though his exact job title changed over the course of his nine-year career at SGC (Managing Director, Merchant Banking at SGC,[11] then Managing Director,

---

[8] Study on Investment Advisers and Broker-Dealers, U.S. Securities and Exchange Commission, January 2011, at 27-8.

[9] Id. at 28.

[10] See id. at 30.

[11] See STAN PI 0000850 at 0000853.

Institutional Division at SGC[12]), the record indicates that Pi's job function was essentially that of a private equity or venture capital fund manager throughout his tenure.  Pi made recommendations (for ultimate approval by Jim Davis) as to illiquid investments in debt and equity securities of unproven, risky companies.  Once those investments were made, Pi helped to oversee those companies in the portfolio and continued to make recommendations regarding ongoing capital calls, in which SIBL, or whoever the owning entity was, was required to provide additional funding.[13]

In this role, Pi was one of the primary agents through whom SGC provided its consulting and investment advisory services to SIBL and the other affiliates.  As such, Pi was also an investment adviser to, and agent of, SIBL and the other affiliates, and was subject to the same fiduciary duties as was SGC.  This would be true whether or not Pi believed he was formally an investment adviser, and whether or not he was registered as such or had received any formal licensing or certification.  In addition, the terms of Pi's employment were governed by a Confidentiality Agreement dated December 13, 2000 and a Code of Business Conduct agreed as of December 13, 2000.

Pi's duties sometimes took on a more strategic role.  He was involved in valuing the transfers of certain ownership stakes to SIBL.[14]  He provided input on determining the consulting and investment advisory fee paid by SIBL to SGC.[15]  He was involved in

---

[12] See STAN PI 0000850 at 0000855.

[13] See, e.g., STAN PI 0002238 (ACON capital call for $21.2MM in January 2009).

[14] See F734-E02580520 (email from Pi to Mark Kuhrt dated January 19, 2005).

[15] See STAN PI 0002913 (email chain dated January 19, 2007, in which Mark Kuhrt states, "[w]e look to Ozzie to advise on the amount" of the consulting fees.).

11

proposals for a new investment fund, of which he would be a manager.[16]  He participated in discussions about structuring the ownership of the private equity portfolio.[17]  He was the voting trustee on several voting trust certificates.[18]  It appears that Pi served on an investment committee with Laura Pendergest, Danny Bogar, and others.[19]  The head of SGC, Danny Bogar, asked Pi for help in picking a new CFO of SGC to replace A.J. Rincon,[20] and Pi was offered the CFO job at one point.[21]  It appears that Pi was a high-ranking and well-respected member of the Stanford management team, and had access to other high-ranking Stanford officers, including Mark Kuhrt, Danny Bogar, Laura Pendergest, Jim Davis, and Allen Stanford.

---

[16] See STAN PI 0002675 (email from William Fusselmann dated November 26, 2008); STAN PI 0002676 (Stanford Global Opportunity Fund draft presentation, listing Pi as one of two "Principal[s]")

[17] See STAN PI 0002383 (email chain among Pi, Kuhrt, Lopez, Davis, Amadio, and Bogar dated January 2, 2007 in which Jim Davis invited Pi to participate in a call with Davis, Gill Lopez, Henry Amadio, Danny Bogar, and Mark Kuhrt to discuss the ownership structure of the private equity portfolio.).

[18] See STAN PI 0001786.

[19] See STAN PI 000463 (email chain dated June 13, 2007 in which Danny Bogar writes to Pi, "I also want all deals to stop unless we have a committee call – (you, me, Bill, Rocky, Laura)."

[20] See STAN PI 0002378 (email from Bogar to Pi dated February 14, 2007).

[21] See Pi Deposition dated June 14, 2016 at 78.

## III.     Red flags

In the course of his service to SGC and SIBL, Pi observed numerous indications of suspicious activity or misconduct ("red flags") that, at a minimum, required further investigation by Pi.  These red flags included:

a.  Pi engaged in and facilitated the use of SIBL funds to purchase private equity interests that were owned not by SIBL, but by Allen Stanford's wholly-owned companies.  Pi became aware of this not later than January 14, 2004.[22]  Such purchases resulted in a transfer of value from SIBL depositors to Allen.

b.  Pi provided valuation outlooks of portfolio companies to be used as a basis for valuing certain assets on SIBL's financial statements.  Pi was aware of this not later than January 19, 2005.[23]  Such use of those projections was improper, as Pi has testified, as they are not reliable or impartial and would pose a danger of inflating the reported value of SIBL's assets.  This did, in fact, inflate SIBL's reported valuation.

c.  While Pi states he was ignorant of SIBL's public representations and investment policies, such ignorance would be incompatible with the

---

[22] See F734-E02580679 (email from Veronica Martinez to Pi dated January 14, 2004 "attach[ing] the list of the wires that went from SIB direct to the companies in which SVCH has investments.")

[23] See F734-E02580520 (email from Pi to Mark Kuhrt dated January 19, 2005 regarding transfers from SVCH to SIBL and enclosing "estimated valuation outlooks... to help you with such transfer.")

13

obligation to ensure that any private equity investments were suitable for SIBL.   Such ignorance would have been a violation of his obligations as an investment adviser to SIBL from shortly after the start of his employment, which began on December 12, 2000.

d.  Notwithstanding his professed ignorance, Pi should have been aware that SIBL's public representations and policies were at odds with its private equity investments:  his position as a high-ranking investment officer required it, Pi was encouraged to cross-sell SIBL CDs by his direct superior on multiple occasions, and he investigated SIBL's lending policies.  Pi was, or should have been, aware of SIBL's lending policies not later than August 13, 2003, the date he reported having investigated SIBL's lending policies.[24]

I discuss these red flags in detail below.

## A.  The use of SIBL funds for non-SIBL purchases

On numerous occasions, the private equity investments that Pi helped to make utilized SIBL funds for the benefit of other Stanford entities that held title to the investments.  The obvious effect of such transactions was to take assets that rightfully belonged to SIBL and give them to another of Allen Stanford's wholly-owned companies.  This reduced the funds available to depositors and enriched Allen Stanford.

---

[24] See F734-E01584219 (email from Pi to Danny Bogar dated August 13, 2003 regarding SIBL loan to Superior).

The record reflects that Pi was aware, or should have been aware, that at least several of the private equity investments he was promoting and facilitating were utilizing SIBL funds but benefitting other entities owned by Allen Stanford.  An email reflects that Pi was aware that "wires went from SIB [SIBL] direct to the companies in which SVCH [Stanford Venture Capital Holdings] has investments."[25]  These wires, according to a spreadsheet attached to a January 14, 2004 email, describe millions of dollars in SIBL funds directed to private equity investments held by SVCH:  American Leisure Holdings, Heartland Food Corp., Elandia, Midwest Cable, GoAntiques, Stronghold, HSSI, Miller Golf, Superior Galleries, USFR, and VICI.[26]  According to an email from Pi dated January 19, 2005, four companies (AST, Datrek Miller, Stronghold, and VICI) were subsequently transferred to SIBL.[27]  This should have indicated to Pi, at the least, that SIBL depositor funds were being improperly appropriated by Allen Stanford's other companies, and that there were not meaningful boundaries between SIBL and Allen Stanford's wholly-owned private equity ventures.

---

[25] See F734-E02580679 (email from Veronica Martinez to Pi dated January 14, 2004 describing SIBL funding of SVCH investments).

[26] See F734-E02580680 (spreadsheet attached to email from Veronica Martinez to Pi dated January 14, 2004 (F734-E02580679)).

[27] See F734-E02580520 (email from Pi to Mark Kuhrt dated January 19, 2005).  See also F734-E02580592 (email from Robert Kramer to Pi and others dated December 2, 2004, enquiring as to valuations of transferred companies and attaching transfer documentation from SVCH to SIBL).

1.020

It appears that Pi was generally aware of the ownership structures for private equity in the Stanford empire. As part of his fund management duties, Pi prepared reports on the private equity portfolio that detailed the ownership of the investments.[28] Pi was involved in planning for the ownership structures that resulted in this non-SIBL ownership.[29] Pi was also aware of, and helped to bring to fruition, the transfer of certain private equity investments back to SIBL that had been funded with SIBL depositor funds.[30]

## B. Valuation

The record indicates that when certain private equity investments were transferred back to SIBL, the transfers were made based on speculative projections of

---

[28] See STAN PI 0002278 (email from Pi to Davis and Bogar dated September 28, 2007, attaching spreadsheet summarizing portfolio investments), STAN PI 0002279 (spreadsheet showing ownership by Stanford entity of private equity investments).

[29] See STAN PI 0002383 (email from Pi to Davis et al dated January 2, 2007, discussing issues including "[p]otentially transfer the deals that reside at SFG to SVCH so that the deals booked in the US are concentrated in SVCH," and "[p]otentially open a merchant banking holding company in the USVI to hold some deals in this company and get the benefit of Mr. Stanford's tax planning there.").

[30] See F734-E02580520 (email from Pi to Mark Kuhrt dated January 19, 2005 regarding transfers from SVCH to SIBL and enclosing "estimated valuation outlooks... to help you with such transfer."); F734-E02580592 (email from Robert Kramer dated December 2, 2004 to Pi et al.).

1.021

the investments' value.[31]  The record also indicates that Pi received information

regarding such transfers, participated in the construction of these speculative

projections, was aware that these valuations were being utilized in the transfers, and

knew or should have known that such usage of these valuations was improper.

In an email from Robert Kramer to Pi and others dated December 2, 2004,

Kramer attached documentation relating to the transfer of four investments (namely,

AST, Datrek Miller, Stronghold, VICI) from SVCH to SIBL.  Kramer enquired as to who

was going to value the transferred interests, and noted that such valuations were

required "in order to increase the capitalization."[32]

The record reflects that Pi subsequently helped to provide these valuations.  As

Pi wrote to Kuhrt on January 19, 2005,

> *While I do not specifically remember I believe you mentioned that the four*
>
> *companies that you had initially transferred to SIB were AST, Datrek*

---

[31] See, e.g., Declaration of Karyl Van Tassel dated April 16, 2015 at ¶19 (Janvey v. Maldonado,
Cause No. 3:14-CV-02826-N-BG) ("Moreover, private equity stakes initially held by other
Stanford Entities (although likely purchased with SIB CD proceeds) were transferred to Allen
Stanford, and then from Stanford to SIB, which recorded them on its books at much inflated
values with no apparent economic substance or gain. These transfers appear to have been
booked for the purpose of giving SIB the false appearance of financial strength based upon the
manner in which the transactions were recorded and related notes on supporting
documentation.").

[32] F734-E02580592 (email from Robert Kramer dated December 2, 2004 to Pi et al.).

17

> *Miller, Stronghold and VICI. I also recall that you said that you used the*
> *estimated valuation outlooks we do every quarter to help you with such*
> *transfer. Enclosed are the sheets for the September quarter for those*
> *companies which will help you with those estimated valuation outlooks.*[33]

However, as Pi subsequently testified, such valuation outlooks were speculative and forward-looking in nature, and not appropriate for valuing a bank's assets:

> *A. This -- what we call estimated valuation outlook, it is a guidance*
> *because the firm requested, Mr. Davis requested that we -- our department*
> *provide a guideline as to what each of these investments may be worth*
> *three-plus years out. Not today, not tomorrow, not in two years, three-plus*
> *years out, assuming -- taking into account management's projections of*
> *each individual companies, what similar companies sell for, a number of*
> *considerations so he can get a guideline. And we were told that this was*
> *not used for any decision making whatsoever, it's just to get a feel for how*
> *this portfolio may perform down the line.*
>
> *...*
>
> *Q. But would you have used it as a current market valuation?*
>
> *A. Not at all.*[34]
>
> *...*

---

[33] F734-E02580520 (email from Pi to Kuhrt dated January 19, 2005)

[34] Transcript of Pi testimony dated February 21, 2012, United States of America v. Robert Allen Stanford, H-09-CR-342 (S.D. Tex.) at 6607-8.

18

> *A. … in order for a valuation to have full force and be objective, it should*
>
> *be done by a third party.*
>
> *Q. An independent outsider?*
>
> *A. Yes.*[35]

As Pi has testified, it was improper to allow those valuation outlooks to be used as the basis for a transfer of assets back to SIBL and to use those valuations to increase SIBL's purported capitalization.  Yet, according to the email record, it appears that Pi consented to and facilitated such usage.

### C. Professed ignorance of SIBL investment policies

Pi has testified that he was unaware of SIBL's CD marketing materials as well as SIBL's investment policies, [36] which were in conflict with the private equity investments that Pi was making on SIBL's behalf.  Accepting this ignorance as true, this should have been a warning sign for someone acting in Pi's position:  an investment adviser or fund manager cannot reasonably make proper investments for his client without knowing what the client's needs and restrictions are.  The so-called "know your client" rule in the securities industry requires securities professionals to have some reasonable basis for the investment recommendations that they are making to their clients.

---

[35] Id. at 6609.

[36] See Pi Deposition dated June 14, 2016 at 48 (Pi was unaware of Tiers I, II, and III prior to lawsuit), at 122 (Pi had not seen the Stanford Training and Marketing Manual); at 126 (Pi had not seen SIBL marketing brochure).

1.024

In the investment adviser context, these duties are well-defined.  An adviser "must make a reasonable determination that the investment advice provided is suitable for the client based on the client's financial objectives."[37]  An investment adviser has a "duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information."[38]  Based on Pi's testimony, he failed to make a reasonable effort to ascertain SIBL's status and suitability for certain types of investments. Additionally, investment advisers cannot make false representations, whether explicit or implied, about their competence.[39]  However, continuing to service an account in ignorance of the customer's needs and restrictions amounts to such a false implied representation of competence.

Upon becoming employed by SGC and serving as an investment adviser to SIBL, Pi was obligated to investigate and understand SIBL's investment objectives, policies, and restrictions.  He should have done so prior to making any investment representations to SIBL, which the record reflects commenced shortly after his employment.  Accepting Pi's professed ignorance as true implies the conclusion that Pi failed to undertake these obligations.

---

[37] Study on Investment Advisers and Broker-Dealers, U.S. Securities and Exchange Commission, January 2011, at 27-8.

[38] Id. at 28.

[39] See id. at 30.

### D. Conflicts with SIBL investment policies and representations

Despite Pi's professed ignorance of SIBL's representations and investment policies, there is reason to believe that Pi did know of these representations and policies, and therefore knew or should have known that these private equity investments were incompatible with those representations and policies. I discuss below what SIBL's representations and policies were, and then the indicia of Pi's knowledge of these policies.

### 1. SIBL's investment policies and representations

SIBL's policies and representations to its depositors were not consistent with commercial loans or with investments in illiquid, speculative private equity investments. SIBL made clear statements that it engaged in lending in only very limited circumstances. SIBL advertised that it "does not expose its customers to the risks associated with commercial loans" and that its "only form of lending is done on a cash-secured basis solely to existing customers."[40] Similarly, SIBL's Training and Marketing Manual stated that SIBL "grants loans only with cash collateral held at the Bank."[41] All the extensions of credit and private equity financings that SIBL provided

---

[40] See March 23, 2015 Maldonado Dep., Ex. 6, SIB Marketing Brochure (STAN MALDONADO 0007474, 7476, also cited as Exhibit 3 of Decl. of Karyl Van Tassel dated June 1, 2011).

[41] STAN PI 0005631 at 0005639 (Stanford International Bank Ltd. Training and Marketing Manual).

21

were clearly contrary to this statement.  The record reflects that Pi was well aware of these loans, which totaled over $80 million as of June 30, 2007.[42]

Similarly, SIBL's statements and policies regarding its safety and liquidity were inconsistent with speculative, illiquid private equity investments.  SIBL's marketing brochure stated that "[t]he Bank's assets are invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."[43]  SIBL's Training and Marketing Manual stated that "[t]he Bank's assets are invested in a strategically-balanced global portfolio of marketable (publicly traded) financial instruments, namely U.S. and foreign securities (Equities and Debt), commodities, fiduciary placements (Deposits with other banks in US dollars or other currencies) and alternative investments."[44]

While private equity investments could conceivably count as alternative investments, SIBL's other statements and policies largely preclude significant private equity investments.  According to the Training and Marketing Manual, "[p]rimary

---

[42] See STAN PI 0002278 (email from Pi to James Davis dated September 28, 2007, attaching spreadsheet of private equity investments, including "breakdown of investment at cost by Stanford company and debt vs. equity"); STAN PI 0002279 (spreadsheet of private equity portfolio companies dated June 30, 2007).

[43] STAN MALDONADO 0007472 (SIBL Marketing Brochure).

[44] STAN PI 0005631 at 0005639 (Stanford International Bank Ltd. Training and Marketing Manual).

alternative vehicles are long/short equity, event driven, and fixed-income arbitrage strategies"[45] – none of which are private equity.

On the whole, these policies prohibit lending to private equity portfolio companies. They also strongly suggest that extensive private equity investments are inconsistent with SIBL's investment goals and objectives.

### 2. Reasons to believe Pi knew of these policies

There is substantial reason to believe that Pi did know of SIBL's stated investment policies. First, Pi, as Managing Director of Merchant Banking and a manager of SIBL's private equity fund, was a high-ranking investment manager and investment advisor to SIBL. He was involved in investment decisions that were made in collaboration with other high-ranking officers, such as Laura Pendergest, Danny Bogar, and Jim Davis. As such, he should have been, and in fact had a duty to, understand SIBL's investment practices and policies. Fund management is a highly regulated industry, with both external and internal requirements, and compliance with regulation and internal policy is a necessary part of the fund adviser's or fund manager's job.

Regarding SIBL's prohibition on all but cash-collateralized lending, the record indicates that Pi was aware of this policy and had researched it. In an email dated

---

[45] STAN PI 0005631 at 0005637 (Stanford International Bank Ltd. Training and Marketing Manual).

August 13, 2003, Pi discussed the possibility of SIBL extending a loan to a portfolio company, and noted that he had investigated SIBL's loan practices, which were limited to lending based on the value of a client's CD.[46]

Additionally, the record shows that Pi was pushed by his direct superior, Danny Bogar, to pitch SIBL CDs.  One such mention appears in Pi's personnel file in his 2005 Second Quarter Review, in which Danny Bogar wrote that:

> *The one area I need Ossie to work on is leveraging his relationships for the sake of the firm.  Again, every person we do business with needs to have an account with Stanford.  I need Ossie to be focused on this while managing the portfolio.  Accountants, Lawyers [sic], consultants, etc. that he deals with should be clients or referring clients to the firm.[47]*

In one case, Bogar directed Pi, over Pi's objection, to pitch SIBL CDs to specific persons, in a Spanish-language meeting with private equity contacts.  Bogar ends the email with the statement, "[y]ou guys can handle it with our standard pitch books."[48] Similarly, with regard to an investment in Vanquish Bank, Bogar wrote, and forwarded to Pi, "[g]oing forward, I am going to assume we as members of the investment

---

[46] See F734-E01584219 (email from Pi to Bogar dated August 13, 2003, stating "I spoke to Beverly Jacobs regarding how SIB goes about the logistics of granting loans.")

[47] STAN PI 0000850 at 0000895 (Pi HR file, 2005 Second Quarter Review).  A handwritten note on the review states "Ok – agreed with DB's advice & suggestion."

[48] See STAN PI 0002368 (email from Bogar to Pi dated July 10, 2007).

24

committee can direct investments into Stanford products once [sic] as a percentage of a balance portfolio."[49]

In sum, it does not seem credible that someone in Pi's position could be wholly ignorant of SIBL's stated policies and practices.  Pi, as an investment adviser to SIBL, had an obligation to understand SIBL's investment policies, objectives, and restrictions.  Pi had access to other high ranking investment officers at Stanford.  There is direct evidence that Pi actually researched SIBL's lending policies.  And Pi, whether he did so or not, was directed by his superior to utilize SIBL's promotional materials to pitch SIBL CDs.

## IV.    Reasonable investigation and actions upon observing red flags

As an investment adviser and agent of SIBL and other affiliates, and as an agent of SGC, Pi was obligated to prudently manage SIBL's and those affiliates' assets, to ensure that investments were suitable for them, and to be informed about SIBL's investment restrictions and objectives.  Pi observed numerous red flags that should have raised a reasonable suspicion that Pi and SGC were failing to fulfill these obligations.  These red flags included, as described above, deals financed by SIBL but benefitting Allen Stanford and his companies, the misuse of speculative valuation outlooks as a basis for SIBL's balance sheet reporting, SGC's and Pi's apparent ignorance of SIBL's investment objectives and restrictions, and the inconsistency between SIBL's policies and the private equity investments that Pi advised and facilitated.  Upon observing these red flags, Pi was under an obligation to undertake

---

[49] STAN PI 0004048 (email from Bogar to Pi dated October 18, 2007).

investigation to determine whether those suspicions were true; he could not continue to perform business-as-usual.

Had Pi investigated these red flags, he would have readily discovered or confirmed that:

- SIBL was expending depositor funds on behalf of Allen Stanford and his wholly-owned enterprises,
- Pi's valuation outlooks were being used in an inappropriate and manipulative manner,
- The private equity investments that Pi facilitated were inappropriate and unsuitable for SIBL, and
- The private equity investments that Pi facilitated were contrary to SIBL's representations to depositors.

As such, Pi would have been unable to continue advising and facilitating SIBL's private equity investments unless SGC's and SIBL's practices were significantly reformed to safeguard SIBL's assets, abide by its investment policies, not mislead its depositors, and use appropriate valuations for reporting.  Absent such reform, Pi would have been unable to continue to facilitate SIBL's and SGC's wrongdoing, and would have been forced to resign his position.

In terms of the time at which these red flags came, or should have come, to Pi's attention, it is my opinion that:

26

- Pi was, or should have been, aware of the wrongful use of depositor funds to benefit Allen Stanford's wholly-owned entities no later than January 14, 2004, the date of receiving the list of direct SIBL wires; [50]

- Pi was, or should have been, aware of the improper use of his valuation outlooks for purposes of valuing SIBL's assets no later than January 19, 2005, the date he provided them to Mark Kuhrt; [51]

- Pi was, or should have been, aware of his own (and SGC's) ignorance of SIBL's investment policies and restrictions shortly after the date he started his employment with SGC, which began on December 12, 2000; [52] and

- Pi was, or should have been aware, of SIBL's lending policies on August 13, 2003, the date he discussed having researched them. [53]

## V.    Warrants

As an agent and employee of SGC, and as a person providing investment advice to SIBL and other Stanford entities, Pi was subject to the duties attributable to investment advisers and agents.  Such duties include the duty of loyalty, which forbids secret profits and undisclosed conflicts of interest.   In addition, Pi signed and

---

[50] See F734-E02580679 (email from Veronica Martinez to Pi dated January 14, 2004 describing SIBL funding of SVCH investments).

[51] See F734-E02580520 (email from Pi to Kuhrt dated January 19, 2005)

[52] See STAN PI 0000850 at 000853 at (Pi HR file, letter from Mary Zora to Pi dated December 12, 2000).

[53] See F734-E01584219 (email from Pi to Danny Bogar dated August 13, 2003 regarding SIBL loan to Superior).

27

acknowledged a Confidentiality Agreement[54] and Code of Business Conduct,[55] each with Stanford Financial Group Company ("SFGC") and its affiliated companies (which includes SIBL and SVCH).  These documents address conflicts of interest, outside compensation, and the process for disclosing and ratifying such conflicts.

The Confidentiality Agreement provides, in part:

> *In keeping with Employee's [Pi's] fiduciary duties to the Company [SFGC and its affiliated companies], employee agrees that he/she shall not ... become involved in any conflict of interest, or upon discovery thereof, allow such a conflict to continue....*

> *Circumstances in which a conflict of interest on the part of Employee would or might arise, and which should be reported immediately by the Employee to an officer of Company, include, without limitation, the following:*

>> *(a) ownership of a material interest in, acting in any capacity for, or accepting directly or indirectly any payments, services or loans from a... entity with which the Company does business...*

>> *(e) the appropriation to the Employee or the diversion to others, directly or indirectly, of any business opportunity in which it is*

---

[54] STAN PI 0000850 at 0000860 – 0000864 (Confidentiality Agreement dated December 13, 2000).

[55] STAN PI 0000850 at 0000865 – 0000871 (Code of Business Conduct dated December 13, 2000).

> known or could reasonably be anticipated that the Company
> would be interested....

The Code of Business Conduct provides, in part,

> A conflict of interest can be generally defined as any situation in which an
> employee's own interest may influence the way he/she handles Company
> business.  An employee's interest conflicts with that of the Company when
> he/she profits, or places himself/herself in a position to profit, directly or
> indirectly, through a misuse of his/her Company position....  For example,
> an employee may ... accept gifts from customers or suppliers that might
> lead to action or inaction on his/her part that is unfavorable to the
> Company.  No employee who is in a position to make or influence a
> decision regarding a business transaction between the Company and a
> third party should accept anything of substantial value from that party....

> Employees ... may not accept gifts, except those of nominal value, or any
> special discounts, loans, payments or the like from any person or firm
> doing, or seeking to do, business with the Company....

> Outside Activities.  Without prior written consent from the employee's
> supervisor and the Compliance Officer, or their designees, employees may
> not engage in the following outside activity or investment: ...
>
> - Have an interest, other than those noted below, in any
>   enterprise which has, or is seeking to establish business
>   relations with the Company.  Employees of the Company may

29

1.034

> *invest in stock or other securities in other companies, subject, in*
> *certain circumstances, to prior written approval by the*
> *Compliance Officer or other officer as specified in the Company's*
> *regulations concerning investments by employees;...*
>
> - *Accept, directly or indirectly, any money or object of value from*
>   *any person or enterprise which has or is seeking business with*
>   *the Company which may affect, or appear to influence, an*
>   *employee's business judgment;...*
> - *Accept finder's fees or introductory fees;....*
>
> *No officer or employee in any position is authorized to depart from the*
> *Company's policies.*

In sum, Pi was obligated to avoid conflicts of interest and to remedy any conflicts that did arise. Pi was also obligated not to accept anything of substantial value that might influence business decisions made on SFGC's, SIBL's, or other affiliates' behalf, such as the decision of which portfolio companies to invest in. Finally, Pi could not accept any interest in any company that SFGC or its affiliates were doing business with, without prior written consent from his supervisor and compliance officer.

The record reflects that Pi received warrants (i.e., options to purchase) shares of companies in which SIBL or other Stanford companies were making investments. The record also reflects that these warrants were of significant value, and comprised a significant amount of Pi's overall compensation.

30

Such warrants (or the potential to receive them) create a major conflict of interest if proper procedures for reviewing and approving conflicts are not followed. Pi was involved in sourcing and structuring investment opportunities for SIBL and other Stanford affiliates, and it is a common concern that an investment adviser in such a position would tend to be biased in favor of deals that are more personally remunerative to the adviser. Also, such deals carry with them the potential for secret profits or compensation if the terms of the compensation are not adequately disclosed in advance, and these profits may well be at the principal's expense.

Further, Pi's negotiation and structuring of his warrant grants are contrary to corporate governance best practices. Typically, employees or agents of a firm do not set their own compensation as this gives rise to substantial adverse incentives between principal and agent. Rather, corporate governance best practices (which have been widely adopted in the U.S.) require that individual employees have their compensation set by disinterested representatives of the employer. In the case of high-ranking officers, which would include "Managing Directors" such as Pi, compensation is often set by a compensation committee composed of disinterested directors. Such procedures have become especially commonplace after corporate frauds such as Enron and the passage of the Sarbanes Oxley Act in 2002, and guard against the possibility that executives pay themselves in ways that harm the firm.

In this particular case, under general principles, corporate governance best practices, and the agreements that he signed, Pi was obligated to disclose any compensation, such as warrants, to his principals. Pi was also obligated to avoid

31

conflicts of interest, such as receiving offers of warrants that could influence his judgment or decision-making on his principals' behalf, and any such conflicts should have been disclosed as and when they arose. Further, according to the Code of Business Conduct, "prior written consent" from Pi's supervisor and compliance officer was required to ratify any such compensation or conflicts of interest.

From my review of the record, it does not appear that Pi attempted to avoid conflicts of interest that might sway his business judgment regarding which companies to invest in. Nor does the record reflect that Pi made full disclosure of the warrants to his principals. Further, the record contains no evidence that written consent (prior or not) was ever obtained with regard to the warrants. It appears, therefore, that Pi was in violation of both general fiduciary principals and his employment agreements when he negotiated and accepted the warrants.

In his defense, Pi testified at deposition that the warrants he received were "subject to [the] discretion" of Jim Davis.[56] Further, Pi has testified that the receipt of his warrants was documented in deal agreements that were signed by Jim Davis and reviewed by counsel.[57] However, none of this is sufficient for purposes of disclosure and approval. Deal counsel would not typically concern themselves with an internal compliance matter unless asked to do so (and I have seen no evidence they conducted, or were asked to conduct, such a review). Presenting a senior executive with a stack of legal documents, relating to an already-negotiated deal whose terms have been finalized, for signature does not ensure that the principal is adequately informed or

---

[56] See Pi Deposition at 260.

[57] See id at 263 – 264, 267.

32

that consent to the warrants is meaningful.  I have seen no written communications discussing warrants with Davis, or any other evidence (apart from the signed deal documents) indicating that Davis was aware of and had approved the warrants.

It should also be noted that Davis also had no authority to speak on behalf of SGC, Pi's employer.  Pi's immediate supervisor, Danny Bogar, was himself conflicted with regard to the warrants, given the fact that he also personally acquired stock warrants as a result of the private equity transactions, meaning that he was not a disinterested person and his approval would not have been sufficient.  Even so, Bogar indicated that he was unaware of at least some of the warrants that Pi negotiated for himself, and there is no evidence of his prior written approval of the warrants.[58]

Additionally, the record does not reflect that Pi obtained prior written approval from a supervisor and compliance officer, as required under the Code of Business Conduct that he signed.  Pi testified in a prior SEC administrative proceeding that he did not receive approval of the SGC compliance department regarding the warrants, and he was unaware of any disclosure to SIBL or other advisee clients regarding the warrants:

> *Q: Did anyone within the SGC compliance group ever ask you about these personal warrants?*

---

[58] See STAN PI 0005281 (email from Danny Bogar to Pi dated March 11, 2008, in which Bogar writes "I have been asked questions from people about warrants being issued.  I do not want you to issue any warrants unless you have discussed this with me prior to documents being executed.  I do not know when, how, or who which is not good for me.  I need to be in the loop, so that I can explain.  Please confirm that you understand and will keep me in the loop.")

33

> A: No.
>
> Q: Did Mr. Young ever ask you about these warrants?
>
> A: No.
>
> Q: Do you know one way or the other if SGC disclosed to its clients that it received warrants for private equity deals that it managed for Stanford International Bank?
>
> A: I wouldn't know.
>
> Q: And did you discuss any issues with Mr. Young about whether or not SGC disclosed that fact to its clients?
>
> A: No, because [the] investment wasn't SGC's. There was no -- It was just a part of our compensation, so --
>
> Q: And he never asked you about it?
>
> A: No.[59]

Bernerd Young, who was the compliance officer of SGC, also testified that he was not apprised of warrants.[60]

Thus, it is my opinion that Pi failed in his duties and obligations to SGC, SIBL, SVCH, and any other investing clients when he accepted warrants on those clients' deals. He did not attempt to avoid conflicts that would influence his business judgment. I have seen no evidence of meaningful disclosure of the warrants to

---

[59] From Pi Civil Testimony at 687-688. Pi also testified that he understood Bernerd Young to be the "head of compliance." Id at 670.

[60] See Transcript dated February 26, 2013 of SEC Administrative Proceeding In the Matter of Daniel Bogar, Bernerd E. Young, and Jason T. Green, File No. 3-15003 at 3166.

counsel, compliance personnel, or his supervisors.  Finally, it is uncontested that Pi

failed to receive prior written approval from his supervisor and a compliance officer, as

required under the Code of Business Conduct.

## VI.     Conclusion

In summary, my opinion is that Pi failed to fulfill his obligations as an

investment adviser to, and agent of, SIBL, SGC, and the other Stanford entities that he

advised with regard to private equity investments.  His duty of care obligated him to

act upon several red flags that he observed — namely the misuse of SIBL funds,

potentially abusive valuations, SGC's and his own ignorance of SIBL investment

policies, and investment policies and statements that were at odds with actual

practice.  Had he investigated these red flags, he would have learned that he was

helping to facilitate the misuse of SIBL depositor funds and the misleading of SIBL

depositors.

Pi also failed in his duty of loyalty to SGC, SIBL, and the other investing

Stanford entities.  Pi structured warrant compensation for himself that created

conflicts and would tend to bias his business judgment.  He failed to adequately

disclose these conflicts of interest and outside compensation to his principals.  He also

failed to abide by the agreements he signed as a condition of his employment, which

obligated him to avoid conflicts, report conflicts that did occur, and obtain prior

written approval prior to accepting any outside remuneration such as warrants.

35

I state under penalty of perjury that the foregoing is true and correct.  Executed on this 20th day of July, 2016.

James C. Spindler

# EXHIBIT A

*to the July 22, 2016 Declaration of James Spindler*

**JAMES C. SPINDLER**

University of Texas School of Law
727 E. Dean Keeton Street
Austin, TX 78705
jspindler@law.utexas.edu

**EMPLOYMENT**

UNIVERSITY OF TEXAS SCHOOL OF LAW
Sylvan Lang Professor of Law, September 2010 to present
Courses:  Federal Income Tax, Corporate Tax, Capital Markets and Financial Intermediation,
Securities Regulation, Business Associations, Commercial Transactions, Corporate Finance
Seminar

MCCOMBS SCHOOL OF BUSINESS, UNIVERSITY OF TEXAS AT AUSTIN
Professor, September 2011 to present

UNIVERSITY OF SOUTHERN CALIFORNIA GOULD SCHOOL OF LAW
Associate Professor of Law and Business, April 2008 to August 2010
Assistant Professor of Law and Business, August 2005 to April 2008
Appointment by courtesy, USC Marshall School of Business

UNIVERSITY OF CHICAGO LAW SCHOOL
Visiting Professor of Law, Spring 2010
Visiting Assistant Professor of Law, July 2004 to June 2005
John M. Olin Fellow in Law and Economics and Lecturer in Law, July 2003 to June 2004

UNIVERSITY OF VIRGINIA SCHOOL OF LAW
Visiting Professor, September 2004

CRAVATH, SWAINE & MOORE LLP
Associate, New York and Hong Kong, 2000 - 2003
Practice focused on securities law, syndicated debt, and international corporate finance

**EDUCATION**

U.C.L.A. DEPARTMENT OF ECONOMICS, Ph.D. 2010, C.Phil. 2008, M.A. 2007
National Science Foundation Graduate Fellowship

HARVARD LAW SCHOOL, J.D. 2000
*Magna cum laude*
John M. Olin Prize in Law and Economics

PRINCETON UNIVERSITY, A.B. 1997
*Magna cum laude* in Politics, certificate in Political Economy

**PUBLICATIONS, PRESENTATIONS, AND GRANTS**

PUBLICATIONS

| 2017 | We Have a Consensus on Fraud on the Market – And It's Wrong, forthcoming *Harvard Business Law Review* |
|---|---|
| 2017 | Taking Systemic Risk Seriously in Financial Regulation, forthcoming *Indiana Law Journal* |
| 2012 | Hidden Costs of Long Term Compensation, 13 *Journal of Theoretical Inquiries in Law* 623 – 642 |
| 2011 | Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?, 13 *American Law & Economics Review* 359 – 401 |
| 2011 | Integrity and Innovation in the Public Capital Markets:  A Survey of the Securities Law Literature, *Research Handbook of Law, Innovation and Growth*, Robert Litan (ed.), (Edward Elgar Press) 45-66 |
| 2011 | Making the Next Financial Crisis Worse, One Regulation at a Time, Forbes.com |
| 2011 | Mandatory Long Term Compensation in the Banking System – and Beyond?, 34 *Regulation* 42 – 48 |
| 2009 | How Private is Private Equity, and at What Cost?, 76 *University of Chicago Law Review* 311-334 |
| 2007 | IPO Liability and Entrepreneurial Response, 155 *University of Pennsylvania Law Review* 1187-1228 |
| 2007 | Why Shareholders Want Their CEOs to Lie More after Dura Pharmaceuticals, 95 *Georgetown Law Journal* 653-691 (reprinted in *Securities Law Review 2008*, Donald C. Langevoort (ed.)) |
| 2006 | Conflict or Credibility:  Analyst Conflicts of Interest and the Market for Underwriting Business, 35 *Journal of Legal Studies* 303-325 |
| 2006 | Is it Time to Wind Up the Securities Act of 1933?, 29 *Regulation* 48-55 |
| 2005 | Corporate Heroin:  A Defense of Perks, Executive Loans, and Conspicuous Consumption (with M. Todd Henderson), 93 *Georgetown Law Journal* 1835-1883 |
| 2005 | Communication by Other Means, 28 *Regulation* 48-53 |

WORKING PAPERS

- Long-term Incentives to Underperform in the Short Term, under submission, available at http://ssrn.com/abstract=2640172

- Vicarious Liability for Managerial Myopia, revise and resubmit to *Journal of Legal Studies,* available at http://ssrn.com/abstract=1986435

- IPO Disclosure, Underpricing, and Litigation Risk, revise and resubmit to *Journal of Legal Studies*, available at http://ssrn.com/abstract=1396818

GRANTS AND AWARDS

NASDAQ OMX Capital Markets Grant 2013-2014

Southern California Innovation Project, February 2009 – February 2010
    Principal Investigator, *The Securities Act and Entrepreneurs' Cost of Public Capital*

Southern California Innovation Project, February 2009 – February 2010
    Principal Investigator, *The Impact of Securities Law Reform on Entrepreneurial Effort*

McDermott, Will & Emery Research Award, June – August 2007

McDermott, Will & Emery Research Award, June – August 2006

James H. Zumberge Faculty Research and Innovation Fund, July 2006 – June 2008
  Principal Investigator, *Do Mandatory Disclosure Rules Result in Better Information for the Marketplace?*

SELECTED PRESENTATIONS

- National Business Law Scholars Annual Meeting, *We Have a Consensus on Fraud on the Market – And It's Wrong*, June 2016
- Midwest Finance Association Annual Meeting, *Long-term Incentives to Underperform in the Short Term*, March 2016
- Federalist Society Academic Section, *Some Fallacies in the Securities Law Literature, and Why We Should Care About Them*, January 2016
- European Association of Law and Economics Annual Meeting, *Long-term Incentives to Underperform in the Short Term*, September 2015
- European Assocation of Law and Economics Annual Meeting, *Structural Implications of the European Banking Union*, September 2015
- Duke University School of Law, *Less Agency Cost, More Long Term Compensation… and More Fraud?*, November 2014
- European Association of Law and Economics Annual Meeting, *Reputation and Corporate Fraud*, September 2014
- National Business Law Scholars Conference, *Reputation and Corporate Fraud*, June 2014
- American Law and Economics Association Annual Meeting, *Why Bank Regulation Failed and Will Continue to Fail*, May 2014
- US Markets Texas Institutional Investor Forum, *What U.S. Funds Need to Know About Shareholder Actions in the United States and Beyond*, November 13, 2013
- European Association of Law and Economics Annual Meeting, *Why Bank Regulation Failed and Will Continue to Fail*, September 2013
- European Association of Law and Economics Annual Meeting, *More Long Term Compensation and… More Fraud?*, September 2013
- Austin Bar Association Section on Business, Corporate and Tax, *Recent Trends in Mergers and Acquisitions*, June 2013
- American Law and Economics Association Annual Meeting, *More Long Term Compensation and … More Fraud?*, May 2013
- University of Texas Mergers and Acquisitions Institute, *Recent Trends in Mergers and Acquisitions*, October 2012
- National Business Law Scholars Conference, *More Long Term Compensation and… More Fraud?*, June 2012
- Global Finance Conference, *Hidden Costs of Long Term Compensation*, May 2012
- Section on Securities Regulation:  Annual Meeting of the American Association of Law Schools, *Hidden Costs of Mandatory Long Term Compensation*, January 2012
- Tel Aviv Law School and Journal of Theoretical Inquiries in Law Conference:  Back to the State, *Mandatory Long Term Compensation for Banks – and Beyond?*, June 2011
- Canadian Law and Economics Association, *Endogenous Compensation in a Firm with Disclosure and Moral Hazard*, October 2010
- University of Chicago Law School Faculty Workshop, *The Effects of Managerial Short-termism on Compensation, Effort, and Fraud*, May 2010
- Conference of Empirical Legal Studies, *IPO Underpricing, Disclosure, and Litigation Risk*, November 2009
- University of Virginia Law & Economics Workshop, *IPO Underpricing, Disclosure, and Litigation Risk*, October 2009

- Kauffman Foundation Summer Legal Institute, *The Future of Capital Markets Regulation*, July 2009
- Stanford/Yale Junior Faculty Forum, *Vicarious Liability for Securities Fraud*, May 2009
- USC Conference on Financial Law and Innovation, *IPO Underpricing and Prospectus Disclosure*, May 2009
- American Law and Economics Association Annual Meeting, *IPO Underpricing and Prospectus Disclosure*, May 2009
- European Financial Management Association Symposium on Corporate Governance, *Vicarious Liability for Securities Fraud*, April 2009
- 21st Annual Australasian Finance Association Meeting, *Vicarious Liability for Securities Fraud*, December 2008
- Stanford Law & Economics Workshop, *Vicarious Liability for Bad Corporate Governance: Are We Wrong About 10b-5?*, November 2008
- Canadian Law and Economics Association, *Vicarious Liability for Securities Fraud*, September 2008
- Kauffman Foundation Summer Legal Institute, *Innovation and Securities Law: Vicarious Liability for Securities Fraud*, July 2008
- American Law and Economics Association Annual Meeting, *Vicarious Liability for Bad Corporate Governance: Are We Wrong About 10b-5?*, May 2008
- University of Chicago Law & Economics Workshop, *Vicarious Liability for Bad Corporate Governance: Are We Wrong About 10b-5?*, April 2008
- Financial Lawyers' Conference, *Securities Law Issues for Financial and Bankruptcy Lawyers*, April 10, 2008
- Berkeley Center for Law, Business, and the Economy, Corporate Roundtable, *Commentator on Grundfest and Bochner, Fixing 404*, April 2007
- American Association of Law Schools Annual Meeting, *Why Shareholders Want Their CEOs to Lie More after Dura Pharmaceuticals*, January 2007
- American Law and Economics Association Annual Meeting, *Conflict or Credibility: Analyst Conflicts of Interest and the Market for Underwriting Business*, May 2006
- USC Summit on Corporate Governance, *The Global View: Convergence of International Corporate Governance Standards*, March 2006
- USC Marshall School of Business Executive Education Program, *State Fiduciary Duties and Recent Developments in Federal Law*, February 2006 (with Eric Talley)
- American Law and Economics Association Annual Meeting, *IPO Liability and Entrepreneurial Response*, May 2005
- Harvard Law and Finance Workshop, *IPO Liability and Entrepreneurial Response*, February 2005
- Directors Roundtable, *Panel on the Revolution in Investment Management*, April 28, 2004
- Directors' Roundtable, *Panel on SEC Enforcement and Disclosure*, December 3, 2003

**PROFESSIONAL AFFILIATIONS AND ACTIVITIES**

Member of the Bar of the State of New York, admitted December 11, 2000

Member, American Law & Economics Association

Referee:
  Journal of Law, Economics, and Organizations
  Journal of Legal Studies
  American Law & Economics Review
  Society of Empirical Legal Studies
  International Review of Law and Economics
  European Journal of Law and Economics

Austin Rugby Club

# EXHIBIT B

*to the July 22, 2016 Declaration of James Spindler*

**EXHIBIT B**

**DOCUMENTS CONSIDERED BY JAMES C. SPINDLER**

***Court Documents Filed in Janvey v. Pi, No. 3-13-cv-775-DG (N.D. Tex.)***

Dkt. 2, Order Regarding Receiver's Motion to Sever Claims

Dkt. 3, Original Complaint

Dkt. 4, Pi's Motion to Dismiss and Brief in Support

Dkt. 5, Appendix to Pi's Motion to Dismiss

Dkt. 6, Receiver's Response to Pi's Motion to Dismiss Complaint

Dkt. 7, Appendix in Support  of Receiver's Response to Pi's Motion to Dismiss

Dkt. 8, Pi's Reply in Support of Motion to Dismiss and Brief in Support

***Court Documents Filed in Janvey v. Pi, No. 3-14-cv-3635 (N.D. Tex.)***

Dkt. 17, Pi's Motion to Dismiss First Amended Complaint

Dkt. 47, Receiver and OSIC's Second Amended Complaint

Dkt. 52, Pi's Motion to Dismiss Second Amended Complaint

Dkt. 64, Receiver's Response to Pi's Motion to Dismiss Second Amended Complaint

Dkt. 65, Pi's Reply in Support of Motion to Stay Scheduling Order & Request for Expedited Consideration

Dkt. 66, Pi's Reply in Support of Motion to Dismiss Second Amended Complaint and Brief in Support

Dkt. 67, Pi's Reply in Support of Motion for Reconsideration, Etc.

Dkt. 68, Order Denying Pi's Motion to Dismiss

Dkt. 69, Order Denying Pi's Motion for Reconsideration

Dkt. 72, Answer to Second Amended Complaint

***Court Documents Filed in SEC v. Stanford, No. No. 3:09-cv-298 (N.D. Tex.)***

Dkt. 1, Complaint

***Court Documents Filed in Janvey v. Maldonado, Cause No. 3:14-CV-02826-N-BG (N.D. Tex)***

1

Dkt, 28, Ex. A, Declaration of Karyl Van Tassel

**Court Documents Filed in In re Laurence Albukerk and EB Financial Group, LLC, SEC File No. 3-14801**

Order Instituting Cease-and-Desist Proceedings

**Depositions taken in Janvey v. Pi, No. 3-14-cv-3635 (N.D. Tex.)**

August 3, 2015 Deposition of Ralph Janvey, with exhibits

June 14, 2016 Deposition of Osvaldo Pi, with exhibits

July 12, 2016 Deposition of Ronald Stein, with exhibits

**Hearing Transcripts in In re Bogar, Young and Green, SEC File No. 3-15003**

Vol. XII

Vol. XI

**Documents Produced in Janvey v. Pi, 3:14-cv-3635-DG by Bates Label**

| Beginning Bates | Ending Bates |
| --- | --- |
| STAN PI 0000237 | STAN PI 0000849 |
| STAN PI 0000850 | STAN PI 0000975 |
| STAN PI 0000976 | STAN PI 0001118 |
| STAN PI 0001119 | STAN PI 0001275 |
| STAN PI 0001276 | STAN PI 0001276 |
| STAN PI 0001277 | STAN PI 0001285 |
| STAN PI 0001286 | STAN PI 0001291 |
| STAN PI 0001292 | STAN PI 0001299 |
| STAN PI 0001313 | STAN PI 0001325 |
| STAN PI 0001339 | STAN PI 0001403 |
| STAN PI 0001404 | STAN PI 0001415 |
| STAN PI 0001416 | STAN PI 0001449 |
| STAN PI 0001450 | STAN PI 0001462 |

1.050

| | |
|---|---|
| STAN PI 0001463 | STAN PI 0001475 |
| STAN PI 0001476 | STAN PI 0001488 |
| STAN PI 0001489 | STAN PI 0001501 |
| STAN PI 0001502 | STAN PI 0001515 |
| STAN PI 0001516 | STAN PI 0001519 |
| STAN PI 0001520 | STAN PI 0001528 |
| STAN PI 0001529 | STAN PI 0001541 |
| STAN PI 0001542 | STAN PI 0001567 |
| STAN PI 0001568 | STAN PI 0001644 |
| STAN PI 0001645 | STAN PI 0001721 |
| STAN PI 0001722 | STAN PI 0001785 |
| STAN PI 0001786 | STAN PI 0001798 |
| STAN PI 0001799 | STAN PI 0001800 |
| STAN PI 0001801 | STAN PI 0001830 |
| STAN PI 0001831 | STAN PI 0001844 |
| STAN PI 0001845 | STAN PI 0001869 |
| STAN PI 0001870 | STAN PI 0001884 |
| STAN PI 0001885 | STAN PI 0001901 |
| STAN PI 0001902 | STAN PI 0001916 |
| STAN PI 0001917 | STAN PI 0001930 |
| STAN PI 0001931 | STAN PI 0001964 |
| STAN PI 0001965 | STAN PI 0001978 |
| STAN PI 0001979 | STAN PI 0001981 |
| STAN PI 0001982 | STAN PI 0001985 |
| STAN PI 0001986 | STAN PI 0001995 |
| STAN PI 0001996 | STAN PI 0002000 |

1.051

| | |
|---|---|
| STAN PI 0002001 | STAN PI 0002028 |
| STAN PI 0002029 | STAN PI 0002035 |
| STAN PI 0002036 | STAN PI 0002157 |
| STAN PI 0002158 | STAN PI 0002197 |
| STAN PI 0002199 | STAN PI 0002210 |
| STAN PI 0002212 | STAN PI 0002212 |
| STAN PI 0002220 | STAN PI 0002220 |
| STAN PI 0002225 | STAN PI 0002226 |
| STAN PI 0002231 | STAN PI 0002233 |
| STAN PI 0002234 | STAN PI 0002234 |
| STAN PI 0002235 | STAN PI 0002236 |
| STAN PI 0002237 | STAN PI 0002237 |
| STAN PI 0002238 | STAN PI 0002239 |
| STAN PI 0002240 | STAN PI 0002240 |
| STAN PI 0002243 | STAN PI 0002243 |
| STAN PI 0002244 | STAN PI 0002262 |
| STAN PI 0002264 | STAN PI 0002265 |
| STAN PI 0002273 | STAN PI 0002273 |
| STAN PI 0002278 | STAN PI 0002278 |
| STAN PI 0002279 | STAN PI 0002279 |
| STAN PI 0002280 | STAN PI 0002281 |
| STAN PI 0002327 | STAN PI 0002327 |
| STAN PI 0002355 | STAN PI 0002357 |
| STAN PI 0002358 | STAN PI 0002358 |
| STAN PI 0002359 | STAN PI 0002360 |
| STAN PI 0002368 | STAN PI 0002369 |

1.052

| | |
|---|---|
| STAN PI 0002375 | STAN PI 0002376 |
| STAN PI 0002378 | STAN PI 0002378 |
| STAN PI 0002383 | STAN PI 0002383 |
| STAN PI 0002384 | STAN PI 0002385 |
| STAN PI 0002389 | STAN PI 0002390 |
| STAN PI 0002396 | STAN PI 0002396 |
| STAN PI 0002401 | STAN PI 0002402 |
| STAN PI 0002418 | STAN PI 0002418 |
| STAN PI 0002419 | STAN PI 0002421 |
| STAN PI 0002442 | STAN PI 0002442 |
| STAN PI 0002461 | STAN PI 0002462 |
| STAN PI 0002469 | STAN PI 0002469 |
| STAN PI 0002673 | STAN PI 0002673 |
| STAN PI 0002674 | STAN PI 0002674 |
| STAN PI 0002675 | STAN PI 0002675 |
| STAN PI 0002676 | STAN PI 0002698 |
| STAN PI 0002723 | STAN PI 0002723 |
| STAN PI 0002724 | STAN PI 0002724 |
| STAN PI 0002725 | STAN PI 0002726 |
| STAN PI 0002731 | STAN PI 0002731 |
| STAN PI 0002913 | STAN PI 0002920 |
| STAN PI 0002939 | STAN PI 0002939 |
| STAN PI 0003338 | STAN PI 0003340 |
| STAN PI 0003913 | STAN PI 0003913 |
| STAN PI 0003917 | STAN PI 0003917 |
| STAN PI 0003950 | STAN PI 0003950 |

1.053

| | |
|---|---|
| STAN PI 0003951 | STAN PI 0003951 |
| STAN PI 0003956 | STAN PI 0003956 |
| STAN PI 0004028 | STAN PI 0004028 |
| STAN PI 0004029 | STAN PI 0004029 |
| STAN PI 0004048 | STAN PI 0004049 |
| STAN PI 0004051 | STAN PI 0004052 |
| STAN PI 0004061 | STAN PI 0004061 |
| STAN PI 0004062 | STAN PI 0004062 |
| STAN PI 0004063 | STAN PI 0004064 |
| STAN PI 0004065 | STAN PI 0004068 |
| STAN PI 0004069 | STAN PI 0004070 |
| STAN PI 0004096 | STAN PI 0004097 |
| STAN PI 0004098 | STAN PI 0004100 |
| STAN PI 0004101 | STAN PI 0004103 |
| STAN PI 0004104 | STAN PI 0004108 |
| STAN PI 0004112 | STAN PI 0004112 |
| STAN PI 0004114 | STAN PI 0004114 |
| STAN PI 0004115 | STAN PI 0004115 |
| STAN PI 0004124 | STAN PI 0004124 |
| STAN PI 0004146 | STAN PI 0004146 |
| STAN PI 0004148 | STAN PI 0004148 |
| STAN PI 0005045 | STAN PI 0005046 |
| STAN PI 0005051 | STAN PI 0005052 |
| STAN PI 0005053 | STAN PI 0005054 |
| STAN PI 0005064 | STAN PI 0005065 |
| STAN PI 0005068 | STAN PI 0005069 |

1.054

| | |
|---|---|
| STAN PI 0005201 | STAN PI 0005202 |
| STAN PI 0005281 | STAN PI 0005281 |
| STAN PI 0005371 | STAN PI 0005371 |
| STAN PI 0005384 | STAN PI 0005384 |
| STAN PI 0005399 | STAN PI 0005400 |
| STAN PI 0005604 | STAN PI 0005604 |
| STAN PI 0005616 | STAN PI 0005618 |
| STAN PI 0005619 | STAN PI 0005621 |
| STAN PI 0005622 | STAN PI 0005627 |
| STAN PI 0005631 | STAN PI 0005650 |
| STAN PI 0005744 | STAN PI 0005752 |
| STAN PI 0005753 | STAN PI 0005761 |
| STAN PI 0005762 | STAN PI 0005777 |
| STAN PI 0005801 | STAN PI 0005803 |
| STAN PI 0005804 | STAN PI 0005805 |
| STAN PI 0005811 | STAN PI 0005811 |
| STAN PI 0005834 | STAN PI 0005849 |
| STAN PI 0005850 | STAN PI 0005857 |
| STAN PI 0005858 | STAN PI 0005861 |
| STAN PI 0005862 | STAN PI 0005865 |
| STAN PI 0005866 | STAN PI 0005873 |
| STAN PI 0005874 | STAN PI 0005880 |
| STAN PI 0005881 | STAN PI 0005896 |
| STAN PI 0005920 | STAN PI 0005920 |
| STAN PI 0012753 | STAN PI 0012755 |
| STAN PI 0012756 | STAN PI 0012757 |

1.055

| | |
|---|---|
| STAN PI 0013362 | STAN PI 0013363 |
| STAN PI 0013688 | STAN PI 0013689 |
| STAN PI 0016567 | STAN PI 0016567 |
| STAN PI 0016568 | STAN PI 0016568 |
| STAN PI 0016569 | STAN PI 0016569 |
| STAN PI 0016570 | STAN PI 0016578 |
| STAN PI 0016579 | STAN PI 0016587 |
| RECEIVER297-064651 | RECEIVER297-064654 |
| RECEIVER297-051387 | RECEIVER297-051388 |
| RECEIVER297-045202 | RECEIVER297-045203 |
| RECEIVER297-046711 | RECEIVER297-046712 |
| STAN MALDONADO 0003393 | STAN MALDONADO 0003458 |
| STAN MALDONADO 0005636 | STAN MALDONADO 0005641 |
| STAN MALDONADO 0006477 | STAN MALDONADO 0006477 |
| STAN MALDONADO 0006491 | STAN MALDONADO 0006500 |
| STAN MALDONADO 0006810 | STAN MALDONADO 0006812 |
| STAN MALDONADO 0007308 | STAN MALDONADO 0007309 |
| STAN MALDONADO 0007343 | STAN MALDONADO 0007344 |
| STAN MALDONADO 0007345 | STAN MALDONADO 0007346 |

1.056

# FINANCIAL CONSULTING AND ADVISORY SERVICES AGREEMENT

This Financial Consulting and Advisory Services Agreement (this "Agreement"), effective as of December 1st 2004, is entered into by and between STANFORD INTERNATIONAL BANK LIMITED, a company duly incorporated under the laws of Antigua and Barbuda, having its office at No. 11 Pavilion Drive, St. Johns, Antigua, W.I. (hereinafter "SIBL"), and STANFORD GROUP COMPANY, a Texas corporation ("SGC") (collectively, the "Parties").

WHEREAS, SGC is a broker-dealer and investment adviser registered with the United States Securities and Exchange Commission ("SEC"), pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and the Investment Advisers Act of 1940 (the "Advisers Act") respectively, and has the necessary resources, skills, training and experience to provide the professional services required by SIBL from time to time; and

WHEREAS, SIBL holds a proprietary investment portfolio (primarily equity), and desires to retain SGC, as an independent contractor, to provide certain financial consulting and advisory services, as described herein, and SGC agrees to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Scope of Services.**

SGC will provide financial consulting and advisory services to SIBL, as further described in Schedule "A" attached hereto, which will include management of certain holdings in SIBL's existing and future portfolio. SGC shall not have custody over, and shall not have discretionary authority with respect to, any funds or other assets of SIBL pursuant to this Agreement. SIBL shall make and bear responsibility for all final decisions made or to be made regarding acquisition or disposition of its holdings.

2. **Compensation and Payment.**

    (a)     SIBL agrees to pay SGC an annual consulting fee, as further described in Schedule "B" attached hereto, which may be revised from time to time.

    (b)     SIBL shall reimburse SGC for all reasonable travel and other out-of-pocket expenses directly related to its agreed upon activities in the course of performing its services hereunder, which shall be consistent with SGC's travel and expense policies. 

3. **Confidentiality.**

The Parties recognize that each may be exposed or otherwise have access to information and data which is confidential or proprietary to the other, and further agree that in the handling and storage of such confidential or proprietary information, each will employ controls, protections and safeguards at least as stringent as it would employ in the handling and storage of its own confidential and proprietary data and information. Nothing herein shall be construed as preventing or prohibiting SGC from disclosing, revealing or producing any data or information

1

SGC


EXHIBIT
4


EXHIBIT
2

STAN PI 0005744

2.001

furnished by SIBL pursuant to a valid court order or subpoena, or a valid request from a governmental and/or regulatory authority. In the event that SGC reveals or discloses any data or information furnished by SIBL pursuant to such order, subpoena or request, then SGC shall have no liability to SIBL under this Agreement.

4.   Independent Contractor.

SGC shall provide all services as an independent contractor on a non-exclusive basis, and unless stated explicitly, nothing contained herein shall be deemed to create any partnership, joint venture, or relationship of principal and agent between the Parties hereto or any of their affiliates, or to provide either Party with any right or power of authority, whether expressed or implied, to create any such duty or obligation on behalf of the other Party.

5.   Conflict of Interest.

SGC agrees to provide consulting services to SIBL on an ongoing, as needed basis. SIBL shall notify SGC of its specific portfolio management requirements. SGC may engage in any other business or professional activities not otherwise in violation of the provisions of this Agreement and SIBL shall have no interest in such business or professional activities. SIBL further acknowledges and agrees that SGC and its affiliates are or may be engaged in the business of investing in, acquiring and/or managing businesses for SGC's own account or the accounts of its affiliates and associates and for the accounts of other unaffiliated parties, and that no aspect of element of these activities will be deemed to be engaged in for the benefit of SIBL nor to constitute a conflict of interest.

6.   Covenants, Representations and Warranties.

   (a)   The Parties covenant and represent that they are each organized corporations in good standing under the laws of such jurisdictions under which they are organized and that the undersigned are officers of the same and authorized to execute this Agreement.

   (b)   SGC represents and warrants that it is qualified under all applicable laws, rules and regulations to perform the services rendered or to be rendered under this Agreement, and shall abide by and comply with all applicable laws, rules and regulations relating to SGC's activities on behalf of SIBL, including ethics rules governing conflicts of interest. SGC shall notify SIBL immediately and in writing at such time as this representation is not true and correct. 

   (c)   SIBL acknowledges that SGC's policies and procedures may require disclosure of its consulting arrangement with SIBL (and the terms thereof) to securities regulators or any actual or prospective clients that may be affected by SGC's work, and SIBL hereby consents to such disclosure by SGC.

7.   Indemnification.

SIBL acknowledges that SGC has no liability for SIBL's investment decisions and does hereby release and hold SGC and its officers, directors and employees harmless from any and all damages or liabilities incurred, or resulting from, SIBL's action or inaction based on any advice or recommendation given by SGC, or otherwise in connection with SGC's provision of services under this Agreement.

2

SGC ~~8~~

STAN PI 0005745

2.002

8.   Assignment.

Neither Party to this Agreement may assign this Agreement or any right or obligation hereunder either in whole or in part without the written consent of the other Party. No assignment pursuant to this Section 8 shall be considered to relieve SGC from its responsibility to perform its obligations under this Agreement.

9.   Notices.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed duly given when actually received upon being delivered by hand, facsimile, first class U.S. mail, or other delivery service or messenger, as follows:

If to SIBL, to:                                     If to SGC, to:

Stanford International Bank Limited,   Stanford Group Company
No. 11 Pavilion Drive                       5050 Westheimer
St. Johns, Antigua, W.I.                    Houston, Texas 77056

Attention: Juan Rodriguez-Tolentino   Attention: Jane Bates
                  President                                    Chief Compliance Officer

Either Party may, by notice to the other Party, change its address set forth above or designate a different address, such change to be effective upon receipt.

10.   Term and Termination.

The term of this Agreement shall commence on the effective date hereof and shall continue in effect until terminated by either Party by giving not less than thirty (30) days prior written notice to the other Party. SIBL may remain obligated to compensate SGC, as provided in Section 2 of this Agreement, for any services rendered to SIBL prior to termination.

11.   Miscellaneous.

(a)   This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings of the Parties, oral and written, with respect to the subject matter hereof. This Agreement may only be supplemented, abandoned, discharged or amended by a written instrument executed by each of the Parties. 

(b)   The section headings in this Agreement are for convenience of reference only, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of the Agreement.

(c)   Either of the Parties may waive any failure on the part of the other Party to comply with any of its obligations, agreements or conditions hereunder. No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. The failure of either of the Parties at any time to

3

SGC ᴛ̶̶̶̶̶

STAN PI 0005746

2.003

enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of such provision, nor to in any way affect the validity of this Agreement or any provision hereof.

(d)   If any of the provisions of this Agreement shall be held invalid, the remainder of this Agreement shall not be affected thereby.

(e)   This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Texas without reference to choice of law doctrine.

IN WITNESS WHEREOF, the Parties have executed this Agreement on and as of the day and year first above written.

STANFORD INTERNATIONAL BANK LIMITED

By: _____

Name:   Juan Rodriguez-Tolentino
        President


STANFORD GROUP COMPANY

By: _____

Name:   A.J. Rincohn
        Executive Vice President, Chief Financial Officer

4

SGC 002227

STAN PI 0005747

2.004

## SCHEDULE A

### DESCRIPTION OF SERVICES

SGC will provide financial consulting and advisory services to SIBL, which will include management of certain holdings in SIBL's existing and future portfolio. SGC will review and monitor the financial condition and business operations of the portfolio companies, including analysis of financial statements and shareholder reports, and will provide evaluations and reports to SIBL in such form as reasonably requested by SIBL. SGC may also perform due diligence and assist in negotiating terms on future investments, as well as provide marketing assistance. In addition, SGC shall provide such other services as may be mutually agreed upon.

*[handwritten annotation]: This does not ~~know or~~ Know of SIB's portfolio because copies market group of SBC. See attached chart re Starzone merchant Banking*

5

SGC ▪▪▪▪▪▪

STAN PI 0005748

2.005

## SCHEDULE B

## CONSULTING FEES

For the performance of its obligation hereunder, SIBL shall pay or cause to be paid to SGC an annual consulting fee in the amount of 3.5% of the book value of the specific holdings in SIBL's portfolio that are managed by SGC, payable on a quarterly basis for services rendered. SIBL and SGC shall annually agree upon the valuation of the portfolio holdings and the calculation of the consulting fee, and make any adjustments mutually agreed upon, including the percentage amount.

SGC

6

STAN PI 0005749

2.006



STANFORD FINANCIAL GROUP
66955.001

SEC INVESTIGATION

CONSULTING AGREEMENTS

66955 - 0001
Client Name    STANFORD FINANCIAL GROUP
Matter Name    SF  INVESTIGATION
Insert Title   CONSULTING AGREEMENTS    F-0001-K

In-dct No. 01

DC

STAN PI 0005750

2.007

STANFORD FINANCIAL GROUP
66395.001

SEC INVESTIGATION

FINANCIAL CONSULTING AND
ADVISORY SERVICES AGREEMENT

STAN PI 0005751

2.008



STANFORD FINANCIAL GROUP
66995.001

SEC INVESTIGATION

CONSULTING AGREEMENTS

STAN PI 0005752

2.009

# Study on Investment Advisers and Broker-Dealers

**As Required by Section 913 of the
Dodd-Frank Wall Street Reform
and Consumer Protection Act**



**This is a Study of the Staff of the
U.S. Securities and Exchange Commission**

**January 2011**

This is a study by the Staff of the U.S. Securities and Exchange Commission. The
Commission has expressed no view regarding the analysis, findings, or conclusions
contained herein.



EXHIBIT
3